# In The United States District Court
## For The District Of Nebraska

James L. Wayne
  plaintiff

v.

Dr. Winters, Attending
Physician et al in his
individual capacity
  defendant

## Motion
For Default Judgement
8:24-CV-00373-JMG-PRSE

FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA
2026 MAY 12 PM 12:58
OFFICE OF THE CLERK

I, Plaintiff James L. Wayne depose and state the foregoing is true and correct to the best of my knowledge

1) That while being detained at Douglas County Dept. of Corrections from January 3, 2024 until August 25, 2025, that during the month of June 2024, Plaintiff began experiencing acute pains that were testicular, groin, and abdominal. In the following weeks of pain, blood began being discharged via urine

RECEIVED
MAY 12 2026
CLERK
U.S. DISTRICT COURT

(1)

2) That Plaintiff vocalized these medical concerns per protocol; to unit officers — directly to medical staff that visited the unit during the day — and via inmate tablet with no satisfactory results.

3) That by July 13, 2024, Plaintiff's condition had elevated to require emergency intervention at U.N.M.C. and having 1½ liters of blood removed from his bladder.

4) That Plaintiff was catherized and placed on a walker, moved to the unsanitary, upper-tier section of the medical unit.

5) That Plaintiff appealed medication for pain from nurses and medical staff was denied to me by Dr. Winters

6) That Plaintiff does not know the full name of Defendant nor forwarding address information as Plaintiff is restricted from such vital personal information as a safety and security response.

(2)

7) That medical facts and evidences are part of Plaintiffs chart and records at U.N.M.C. as well as witnesses to give testimonies to material facts that this Honorable Court may order.

8) That Plaintiff medical chart information from corrections at D.C.D.C., R.T.C., and O.C.C. have every material fact and violation retained on file to be exposed by court order.

9) Plaintiff claim of causation of Hematuria, and the nosocomial bacterial infection has it's birth in Defendant Dr. Winters intentional neglect, indifference, dereliction to supervise, review, and follow up treatment has and continues to harm Plaintiff.

## Exhibit I

Defendant took the Hippocratic Oath against doing any harm, and intentional harm to anyone, even as a private individual, especially from abusing of body man or woman, bond or free. His training, ethics, and common sense humane compassion should have guided Defendant to check, follow-up, review, Plaintiff

(3)

in person or by chart following a surgical procedure; or even an emergency transport. Finally, Defendant knows leaving a catheter in a body that is discharging urine and blood for months, would give rise to bacterial infection

## Exhibit 2

Defendant Dr. Winters was aware of news articles of inferior services by both employers of his; Wellpath Health Care Services, NDC Medical Director Jerry Lovelace, as well as, following the questionable mandates of Neb. State Statute 83-4,153

## Exhibit 3, 4, 5, 6

Demonstrates the ongoing effects and damages, injury, pain, and suffering addressing infections, hematuria in Plaintiff from these initial neglects and discriminations, barring enjoyment of a community standard of Health care as contracted to provide to Plaintiff.

## Civil Rights

Qualified immunity balances two important interest:

(4)

— the need to hold public official accountable when they exercise power irresponsibly, and

— the need to shield officials from harrassment distraction and liability when they perform their duties reasonably

Officials are entitled to qualified immunity, unless a Plaintiff can show:
- that the official violated a statutory or constitutional right and

- that the right was clearly established at the time of the challeged conduct

State sovereign immunity does not extend to cases where Plaintiff alleges the states action is in violation of the federal or state constitution. (Dept. of Revenue v. Kuhnlein 646 So. 2nd 717)

Sovereign immunity does not exempt the state from a challege based on violation of the Federal or State Constitutions because any other rule self-evidently would make constitutional law subservient

(5)

to the states will. Moreover, neither the common law nor a state statute can supercede a provision of the Federal or State Constitutions ( 721 Florida Supreme Court 1994)

The 42 U.S.C. § 1983, allow state officials to be sued in their individual or official capacities a principle which is demonstrated in; Brandon v. Holt 469 U.S. 464, 105 S. Ct. 873 83 L. Ed 2nd 878 (1985)

The 8th Circuit, Doe v. Nebraska 345 F. 3rd 593 597 (2003) Ret. Oct. 1, 2017 states:

> ... as long as the state entity receives federal funding then the sovereign immunity for discrimination cases is not abrogated but voluntarily waived. Since the receiving of the federal funds was optional, then the waiver of sovereign immunity was optional. If a state entity wanted its sovereign immunity back; all they have to do in these circuits is stop receiving federal funding (see also; The United States Code, Title 42, Althouse Topping the State Court Resource 44 Vand. L. Rev. 953, 973 (1991))

U.S.C. 8th Amendment

    ... nor cruel and unusual punishments inflicted

cruel — disposed to inflict pain and suffering, devoid
    of humane feeling, causing or conducive
    to injury, grief, or pain

unusual — uncommon, rare

Plaintiff experiences and has by Defendant's choices,
both the cruel and the unusual, and he denied, in a
discriminatorial practice that lasted to the end of
his tenure at D.C.D.C., Plaintiff right and enjoyment
of a community standard of health care services
contracted to by 83-4,153 Neb. Rev. Stat. was denied

Nebraska State Constitution, Article I, Sec. 4 (1875)

1-16 Bill of attainer, retroactive laws, contracts, special privileges
    ... no expo facto law impairing the obligation
    of contracts, or grants special privileges of
    immunity shall be passed

(7)

## Relief, Damages, Judgement

Plaintiff having submitted complaint, offered evidences, and proofs to this Honorable Court in a good faith effort to meet Federal Rules of Civil Procedures, does now seek damages to the original sum $750,000^{00}$ compensatory, and punitive damages to be affixed by a jury, this to meet a minimum of ongoing medical and legal obligations, as NDCS is regularly deferring medication costs to commissary purchases as well as legal.

Plaintiff still welcomes a jury trial to summons before this Honorable the documentary evidences, witnesses, and defendants.

## Exhibits

1) Hippocratic Oath
2) News report, New York Staff writer, NDC Medical Director
3) NDCS Clinical Encounter, Admin. Note 9/5/2025
4) NDCS Clinical Encounter, Admin. Note 4/20/2026
5) NDCS Clinical Encounter, Admin. Note 3/30/26
6) NDCS Consultation Request 1/22/2026
7) Wellpath Health Care Services / Flyer / Promotion
8) Wexford Health Care Services / Promotion / Flyer





EXHIBIT
1

# Hippocratic Oath

The **Hippocratic Oath** is an oath of ethics historically taken by physicians. It is one of the most widely known of Greek medical texts. In its original form, it requires a new physician to swear, by a number of healing gods, to uphold specific ethical standards. The oath is the earliest expression of medical ethics in the Western world, establishing several principles of medical ethics which remain of paramount significance today. These include the principles of medical confidentiality and non-maleficence. As the foundational expression of certain principles that continue to guide and inform medical practice, the ancient text is of more than historic and symbolic value. It is enshrined in the legal statutes of various jurisdictions, such that violations of the oath may carry criminal or other liability beyond the oath's symbolic nature.

## Text of the oath

The original oath was written in Ancient Greek, between the fifth and third centuries BC.[1] Although it is traditionally attributed to the Greek doctor Hippocrates and it is usually included in the Hippocratic Corpus, modern scholars do not regard it as having been written by Hippocrates himself. The oldest manuscript containing the oath dates to roughly the 10th–11th century, held in the Vatican Library, although [2] papyrus fragments of the oath have been found as early as the 3rd century AD.

Below is the Hippocratic Oath, in Ancient Greek, from the 1923 Loeb edition, followed by the English translation:

ὄμνυμι Ἀπόλλωνα ἰητρὸν καὶ Ἀσκληπιὸν καὶ Ὑγείαν καὶ Πανάκειαν καὶ θεοὺς πάντας τε καὶ πάσας, ἵστορας ποιεύμενος, ἐπιτελέα ποιήσειν κατὰ δύναμιν καὶ κρίσιν ἐμὴν ὅρκον τόνδε καὶ συγγραφὴν τήνδε:

I swear by Apollo Healer, by Asclepius, by Hygieia, by Panacea, and by all the gods and goddesses, making them my witnesses, that I will carry out, according to my ability and judgment, this oath and this indenture.

ἡγήσεσθαι μὲν τὸν διδάξαντά με τὴν τέχνην ταύτην ἴσα γενέτῃσιν ἐμοῖς, καὶ βίου κοινώσεσθαι, καὶ χρεῶν χρῄζοντι μετάδοσιν ποιήσεσθαι, καὶ γένος τὸ ἐξ αὐτοῦ ἀδελφοῖς ἴσον ἐπικρινεῖν ἄρρεσι, καὶ διδάξειν τὴν τέχνην ταύτην, ἢν χρῄζωσι μανθάνειν, ἄνευ μισθοῦ καὶ συγγραφῆς, παραγγελίης τε καὶ ἀκροήσιος καὶ τῆς λοίπης ἁπάσης μαθήσιος μετάδοσιν ποιήσεσθαι υἱοῖς τε ἐμοῖς καὶ τοῖς τοῦ ἐμὲ διδάξαντος, καὶ μαθητῇσι συγγεγραμμένοις τε καὶ ὡρκισμένοις νόμῳ ἰητρικῷ, ἄλλῳ δὲ οὐδενί.

To hold my teacher in this art equal to my own parents; to make him partner in my livelihood; when he is in need of money to share mine with him; to consider his family as my own brothers, and to teach them this art, if they want to learn it, without fee or indenture; to impart precept, oral instruction, and all other instruction to my own sons, the sons of my teacher, and to indentured pupils who have taken the Healer's oath, but to nobody else.

I will use those dietary regimens which will benefit my patients according to my greatest

διαιτήμασί τε χρήσομαι ἐπ᾽ ὠφελείῃ καμνόντων κατὰ δύναμιν καὶ κρίσιν ἐμήν, ἐπὶ δηλήσει δὲ καὶ ἀδικίῃ εἴρξειν.

οὐ δώσω δὲ οὐδὲ φάρμακον οὐδενὶ αἰτηθεὶς θανάσιμον, οὐδὲ ὑφηγήσομαι συμβουλίην τοιήνδε: ὁμοίως δὲ οὐδὲ γυναικὶ πεσσὸν φθόριον δώσω.

ἁγνῶς δὲ καὶ ὁσίως διατηρήσω βίον τὸν ἐμὸν καὶ τέχνην τὴν ἐμήν.

οὐ τεμέω δὲ οὐδὲ μὴν λιθιῶντας, ἐκχωρήσω δὲ ἐργάτῃσιν ἀνδράσι πρήξιος τῆσδε.

ἐς οἰκίας δὲ ὁκόσας ἂν ἐσίω, ἐσελεύσομαι ἐπ᾽ ὠφελείῃ καμνόντων, ἐκτὸς ἐὼν πάσης ἀδικίης ἑκουσίης καὶ φθορίης, τῆς τε ἄλλης καὶ ἀφροδισίων ἔργων ἐπί τε γυναικείων σωμάτων καὶ ἀνδρῴων, ἐλευθέρων τε καὶ δούλων.

ἃ δ᾽ ἂν ἐνθεραπείῃ ἴδω ἢ ἀκούσω, ἢ καὶ ἄνευ θεραπείης κατὰ βίον ἀνθρώπων, ἃ μὴ χρή ποτε ἐκλαλεῖσθαι ἔξω, σιγήσομαι, ἄρρητα ἡγεύμενος εἶναι τὰ τοιαῦτα.

ὅρκον μὲν οὖν μοι τόνδε ἐπιτελέα ποιέοντι, καὶ μὴ συγχέοντι, εἴη ἐπαύρασθαι

ability and judgment, and I will do no harm or injustice to them.[4] Neither will I administer a poison to anybody when asked to do so, nor will I suggest such a course. Similarly I will not give to a woman a pessary to cause abortion. But I will keep pure and holy both my life and my art. I will not use the knife, not even, verily, on sufferers from stone, but I will give place to such as are craftsmen therein.

Into whatsoever houses I enter, I will enter to help the sick, and I will abstain from all intentional wrong-doing and harm, especially from abusing the bodies of man or woman, bond or free. And whatsoever I shall see or hear in the course of my profession, as well as outside my profession in my intercourse with men, if it be what should not be published abroad, I will never divulge, holding such things to be holy secrets.

Now if I carry out this oath, and break it not, may I gain for ever reputation among all men for my life and for my art; but if I break it and forswear myself, may the opposite befall me.[3]

—Translation by W.H.S. Jones



A fragment of the oath on the 3rd-century Papyrus Oxyrhynchus 2547

## Certificate Of Service

Plaintiff <u>JAMES L. WAYNE</u> deposes and states that the aforemention testimony, informations, and claims are true and accurate to the best of my Knowledge, this I swear under the penalty of purgery

Sworn to this __6__ day of May 2026

<u>Notary</u>       <u>James L. Wayne</u>
                           plaintiff

Witnessed before me
this __6th__ day of May 2026
and affirmed by my seal

<u>Konda G. Young</u>
     Notary



GENERAL NOTARY - State of Nebraska
KONDA G. YOUNG
My Comm. Exp. November 13, 2026

# Prison

From A1

Lovelace's willingness to deny specialists' recommendations, such as the recommendation from Voigt, marks a departure from the previous director, Harbans Deol, who told the News-Times he could not recall ever denying the recommendations.

## Denials of medical consult requests surges

The denial and deferral rate of medical consult requests was about 15 times higher during the first seven months of Lovelace's tenure than during the last 25 months of Deol's.

Lovelace's denials or deferrals included cancer screenings like colonoscopies and mammograms, along with orthopedic and dental care, spanning nearly all the department's facilities and prompting concern from incarcerated individuals and advocates. None of the requests are related to mental health care, which is handled internally and does not require review by the medical director, Lovelace said.

"The significant increase in denial of requests for typical medical care is very concerning and could have hundreds of people at risk of worsening health or death," said Dr. Will Weber, medical director of the prison health advocacy nonprofit Medical Justice Alliance, after reviewing the data. The organization is a nationwide group of volunteer physicians who review medical records for

   

**Boyd**      **McKinney**      **Liner**      **Deol**

All consult requests are now considered a part of an inmate's file and therefore confidential and exempt from public disclosure by state law, according to the department's public records manager.

## 'We work to arrive at a decision best for the patient'

Lovelace declined to give an in-person or phone interview, but in emailed statements he outlined his process for reviewing the requests and answered questions. He said he "cannot speak to the process used by the previous medical directors at NDCS."

He said his review process for consult requests is "based on medical necessity, community standard of care and InterQual criteria — evidence-based guidelines used by health care organizations to assess the appropriateness of clinical care."

To see prison medical staff, Lovelace said, incarcerated individuals first submit a form that is reviewed by a nurse. If appropriate, the nurse refers the individual to the facility's health provider. The health providers may be doctors or nurse practitioners, depending on the facility.

If the prison's health providers

2024, request for an echocardiogram from the women's prison is Castor's, but the timing lines up with her medical records. Even though the procedure was technically "deferred," Castor said during an interview that she never ended up receiving the echocardiogram. She said she has received some treatment for the toe wound.

The consult requests marked "denied" are usually the ones assessed by Lovelace as "ATP" or needing alternative treatment plans. For instance, a request from a provider at the Work Ethic Camp in McCook for an individual who needed a steroid injection behind his knee was denied by Lovelace, who suggested an alternative treatment plan, writing, "this can be performed on-site. Will schedule a visit when several injections needed."

An alternative treatment plan is "rarely a denial of medical services," Lovelace said in his email to the News-Times. If a provider disagrees with an alternative treatment plan, Lovelace said, the provider calls him and they discuss the case. "We work to arrive at a decision best for the patient."

Some incarcerated individuals and advocates, though, expressed concern that requests for medical

wrote in an email that it took her months to get a request for a mammogram approved after she found a lump in her breast.

Aron Boyd, 50, who is incarcerated at the Community Correctional Center in Omaha, wrote that he was denied a colon screening and a prostate screening by Lovelace even though, as a Black man, Boyd is supposed to have both of those screenings starting at age 45. "I am told I do not qualify due to the medical director's preference to wait to around the old standard of 55," Boyd wrote in an email.

Lovelace told the News-Times his policy was to start those screenings at age 45 or at 40, if there is family history. But Boyd said he never received either procedure and was explicitly told it was because of department policy. "Whoever this director is isn't interested in giving proper care," Boyd wrote.

Boyd said he was surprised by the department's approach to his medical care given that in 2019 he won a $115,000 settlement against the department after being ignored by medical staff while having a heart attack. Since then, he said, he has still struggled to get approved to see a cardiologist.

In response to another question about the increase in denied consults during his tenure, Lovelace again wrote that his process is based on medical necessity, community standard of care and InterQual criteria.

But Weber pointed to medical consult requests that appeared to align with national guidelines, yet were denied by Lovelace.

the News-Times, referring to a recommendation by an outside specialist, such as Voigt's recommendation of an echocardiogram. Voigt did not respond to phone calls made to his home and office phones.

Lovelace said he does not draw such a distinction. "My decision depends on the amount of information supplied by the provider, which allows me to make an informed decision," he wrote.

## Long-standing concerns about prison medical care

Concerns about medical care in Nebraska's prisons long predate Lovelace's arrival.

In 2017, about the time Deol started his job, the ACLU and other organizations filed a lawsuit against the prison system over its medical care. Deol told the News-Times the department tried to improve care in response to it. McKinney was critical of Deol, as were some formerly incarcerated individuals who spoke with the News-Times. The lawsuit was ultimately dismissed.

Since then, Nebraska's prison population has grown. It is also aging, and according to a September report from the state inspector general, about half the prison system's nursing jobs are not filled. One facility with well over 500 inmates has no full-time primary doctor on staff, in violation of state statute.

The Nebraska Department of Corrections is not accredited by the National Commission on Correctional Health Care, a

...rely on these requests to provide care for patients when medical staff lack the resources or specialty care needed to meet health needs," Weber said, adding that many of the requests that Lovelace denied or deferred seemed reasonable and aligned with national guidelines of care.

Between Jan. 1, 2021, and Feb. 1 2023, Deol denied or deferred around 1.1% of medical consult requests, according to the department's data. Between Oct. 30, 2023, and June 2, 2024, Lovelace denied or deferred around 16.5%.

Dr. Jefferey Kasselman, who served as interim director after Deol's last day on February 1, 2023, and before Lovelace started on Oct. 30, 2023, denied or deferred about 1.9% of requests.

The rates are based on over 10,000 requests for medical procedures and specialist consultations received by the department between January 2021 and June 2, 2024, and provided to the News-Times. Lovelace confirmed that his approval rate was about 83%, while Deol's was about 99% and Kasselman's was about 98%, based on the records.

There is no data available after June 2 — about two months after the News-Times first asked the department for the data — because in June the department switched to an electronic medical records system and no longer maintains a spreadsheet with the consult requests, Lovelace said.

system's medical director. The medical director reviews thousands of these consult requests every year.

The state prison system provides care for about 5,800 people, according to a 2024 report from the Inspector General's Office. Incarcerated individuals at the 275-bed women's prison have said their care is sometimes delayed or denied by on-site medical providers well before a provider submits a consult request, which could be delayed or denied by the medical director.

The provider at the women's prison, Xann Linhart, an advanced practice registered nurse, submitted a consult request for Castor to see Voigt. Then another consult request had to be submitted in order for Castor to receive the echocardiogram. Linhart did not respond to an email asking for an interview.

Lovelace said he gives consult requests four assessments: approval, partial approval, need additional information or an alternative treatment plan.

Castor's request for an echocardiogram, based on Voigt's recommendation, appears to have been assessed as "NMI," or, needing more information, and marked "deferred" by Lovelace, according to the consult data.

Identifying information in the consult data is redacted, so it is impossible to say with absolute certainty that the deferred Feb. 1,

Before coming to Nebraska in October 2023, Lovelace worked for Centurion and Corizon, two private, for-profit prison health care providers in Missouri. Corizon has faced scrutiny in the last year after it filed for bankruptcy amid numerous medical malpractice lawsuits.

While in Missouri, Lovelace was the subject of a handful of federal lawsuits over denial of care. One lawsuit, which is ongoing, alleges that in 2021 while working as a regional director for Corizon, Lovelace declined to approve shoulder replacement surgery after it was recommended by two orthopedists because he found there was "insufficient information provided to determine the necessity for shoulder replacement." As regional director, the lawsuit says, Lovelace was in charge of approving medical appointments and specialty treatment outside the prison.

Lovelace denied the allegation in a filing and said in an email to the News-Times he could not comment on pending litigation.

State Sen. Terrell McKinney of Omaha, who has advocated for prison reform bills in the State Legislature, said he has concerns about the new medical director. He said in a phone interview that his office had heard from family members of incarcerated individuals about problems getting specialty care under Lovelace.

Holly Liner, who is incarcerated at the women's prison in York,

intestinal cancer, despite national guidelines that a colonoscopy should be performed, Weber said, based on the consult data. In another request, Weber said a radiologist — a specialist in medical imaging — recommended a CT scan of a patient's spine due to concerning findings on the X-ray, but that was denied without justification.

"Denying reasonable requests undermines the medical judgment of the providers seeing the patients, leaving [providers] unable to access the care their patients need and that the providers feel unable to provide," Weber said.

Deol, who served as medical director between 2017 and 2023, said that during his first year he spoke by phone weekly with the providers at every facility to go over all of the consult requests. In subsequent years, he said, he mostly made the decisions on his own, but like Lovelace, he said, he sometimes called the provider to discuss the consults.

He declined to comment on the increase in denied and deferred consults since Lovelace took over.

But Deol seemed to draw a distinction between denying a consult request from a prison medical provider and denying a request recommended by an outside specialist, such as Voigt.

"I don't know if I ever really denied a specialty procedure if they felt it was necessary," Deol said in a phone conversation with

and reviews department practices for compliance, according to Robert Simon, the program's director of accreditation. The program does not specifically look at the denial or deferral rate of consult requests, Simon said, though it does review the departments' process of receiving and responding to medical consult requests.

With no more public access to the data, it is unclear what the denial or deferral rate of consult requests has been under Lovelace since June.

After the department denied a public records request for medical consult data after June 2, the Attorney General's Office, which reviews appeals of public records requests, affirmed the decision.

Though consult data has been stored by the department in a publicly accessible way for years, Assistant Attorney General Leslie S. Donley said there was no statutory requirement for the prison system to do so.

"We realize the [Nebraska Department of Correctional Services] previously compiled inmate consult and procedure requests in a spreadsheet and made that spreadsheet available to you (with redactions). However, we are unaware of any statute that requires the NDCS to continue to create the spreadsheet," Donley wrote.

**Mike Brownlee and Lauren Cross contributed to this report.**



in rural Lawrence County in western Pennsylvania, one of the

for lawmakers to require equipment manufacturers to grant

JEFFREY PHELPS, ASSOCIATED PRESS

EXHIBIT

2

...sentence. Earlier this year, Castor had begun seeing a specialist for a se... so much she could barely walk. That specialist recommended a procedure that Castor...

...ere she is ...foot to swell

# Inmate medical care denied at much higher rate

## Denial or deferral of procedures increasingly common within Nebraska's prison system under new medical director

**WILLIAM SWETT**
York News-Times Staff Writer



Lovelace

YORK, Neb. — In March, a 75-year-old woman incarcerated at Nebraska's only women's prison was surprised to discover a troubling note tacked onto one of her medical records.

Wilma Castor had just begun seeing a specialist for a severe toe wound that caused her foot to swell so much she could barely walk, let alone work.

The wound care specialist, Dr. David Voigt, suspected that Castor had an embolus — a blockage in a blood vessel — on her toe.

Among other recommendations, he suggested Castor have an echocardiogram, a heart ultrasound, to "rule out a cardiac source" for the embolus, according to medical records, which Castor shared with the News-Times.

But Castor never received the echocardiogram. Instead, she was told that the prison system's medical director believed the procedure was unnecessary. The director's decision prompted Voigt to write the note at the bottom of a checkup document.

"The medical director at the prison has denied her an echocardiogram to rule out a cardiac source for the emboli. I feel that this should be done to complete the workup, but the patient obviously can't get access to it if it was denied by the prison," Voigt wrote.

The medical director's response to Castor's request for an echocardiogram wasn't an isolated incident.

The denial or deferral of essential medical procedures, such as cancer screenings and heart tests, is increasingly common within Nebraska's prison system under the new medical director, Dr. Jerry Lee Lovelace Jr., according to thousands of inmate requests for medical procedures and consultations with specialists received by the prison system's medical directors between January 2021 and June 2024. The data is not available after June because the department stopped making it publicly available.

Please see PRISON, Page A4

---

That the decision is coming on a Wednesday is unusual — the Nebraska Supreme Court typically issues opinions on Fridays. The timing may be related to the state's rapidly approaching voter registration deadlines: Oct. 18 for online registration, and Oct. 25 for in-person registration at county election offices.

"We are eagerly awaiting this decision," Rose Godinez, legal director for the ACLU of Nebraska, said Tuesday. "We encourage impacted Nebraskans to follow the news closely tomorrow."

Since 2005, Nebraskans with felony convictions have had their voting rights restored after a two-year waiting period upon completion of their sentences. Last legislative session, lawmakers approved Legislative Bill 20, which took effect in July and eliminated the two-year waiting period.

Both LB 20 and the 2005 law, LB 53, were thrown into question after Nebraska Attorney General Mike Hilgers, at the request of Nebraska Secretary of State Bob Evnen, issued a nonbinding legal opinion in July finding the laws unconstitutional. Hilgers concluded that restoration of voting rights is a form of clemency and thus is an exclusive power of the Board of Pardons, which consists of Hilgers, Evnen and Nebraska Gov. Jim Pillen.

Although Hilgers' opinion does not carries the force of law, Evnen quickly directed county election officials to stop allowing anyone with a felony conviction to register to vote — including those who completed the waiting period previously required under LB 53. Attorneys for Evnen argued in court that he has the right to defy laws that he believes to be unconstitutional.

Please see **FELON**, Page A2

---

# US warns Israel to boost humanitarian aid

Officials claim they will pull funding if assistance to Gaza doesn't increase

**TARA COPP, MATTHEW LEE AND LOLITA C. BALDOR**



Austin, thought it was appropriate to make clear to the government of Israel that there are changes that they need to make again, to see that the level of assistance making it into Gaza...

Omaha Correctional Center
Individual's name: JAMES L. WAYNE
Individual's #: 220769
PO BOX 11099 - Omaha NE 68111
Notice: This correspondence was mailed from
an institution operated by the Nebraska
Department of Corrections.
It's contents are uncensored.



RECEIVED

MAY 1 2 2026

CLERK
U.S. DISTRICT COURT

Privileged Mail
Do Not Open

Office Of The Clerk
United States District Court
Roman L. Hruska U.S. Courthouse
111 S. 18th Plaza, Suite 1152
Omaha, Nebraska 68102-1322

8:24-CV-00373-JMG-PRS